Thank you, Madam Clerk. Please call the last case of the day. 3-12-0244 Malcolm Henry Thorne, et al. Ambulance for Timothy Elliott v. Eric Riggs and Scott Riggin Appellants by Darryl Siegler. Mr. Siegler, you may proceed. Thank you, Your Honor. Good afternoon. I represent the appellants in this matter, Eric Riggs and Scott Riggin, appealing from the judgment of the trial court, Your Honors, in a common law fraud case. The action involved allegations of fraud in the inducement in connection with the purchase by the plaintiffs of a 50 percent interest in a limited liability company, Heritage Fields Oglesby, which was established to acquire and develop land into a subdivision in Oglesby, Illinois. The plaintiffs sought in their fraud in the inducement complaint rescission of the subject contract and rescissionary damages as well. After a lengthy bench trial, the trial court granted rescission of the purchase contract and judgment in the favor of the plaintiffs in the amount of $1,205,000. The court further ordered that upon payment of the judgment in full in order to restore the parties to status quo that the plaintiffs were to convey their 50 percent interest in the HFO back to the defendants. The record in this case, Your Honors, is large. So are the briefs. I will try to cover all of the central issues. If I fail, I hope that you will understand that it is my fervent wish that the briefs suffice as to what I was unable to cover. This appeal is not an attack on the credibility findings of the trial court, despite the response brief which has alluded to my position on credibility, or I guess a lack of position on credibility. In my brief, this is not an attack on the credibility findings of the trial court. I am well aware of the deference given to those findings in the law. It is about the fair and convincing proof standard that applies to common law fraud cases and certain important issues of law. The trial court to summarize, it's difficult to summarize because it is evident that the record is large, Your Honors. To summarize, the trial court found, I believe, four things in this case to have occurred that constitute common law fraud. Two are representations deemed to be fraudulent misrepresentations, that is actual statements that were found to be made by the defendants to the plaintiffs, and two concealments, that is silence as to two matters pertaining to well, one directly pertains to one of the representations and the other has to do with the contract itself in terms of encumbrance or encumbrances on land. I have to focus a bit on what I consider to be critical issues in the case, so forgive me for being slightly out of order. Apart from the issues relating to sufficiency of evidence or whether certain evidence can support a finding of fraud in this case, I want to first start with the problem that I perceive in the trial court's finding in connection with the fraudulent concealments. There are two that were found by the court to exist. One, the concealment of stormwater issues that pertain to the subdivision and the fact that they were not mentioned or disclosed in 2005 before the contract of December 2005. The other has to do with a right of repurchase, an easement, and the obligation to build a portion of roadway that was imposed on my clients individually when they purchased a piece of land for Phase 3. There was a requirement to build a small portion of road for access to the remaining property of the sellers. It is important in my estimation to remember that this is a fraud in the inducement case. This is not a breach of contract case. Therefore, I have always approached this case in terms of fraud in the inducement, representations, and concealments that by definition under the law took place in negotiation phases prior to the execution of the contract. I believe that that's important, and I'll get to that in a bit. In terms of a critical problem that I would submit to the court in terms of the concealment issues was the trial court's finding of a pre-contract, I believe, what amounts to a pre-contract existence of a joint venture that creates a fiduciary relationship between these parties. Specifically, just to quickly summarize the record, the plaintiffs did not allege the existence of a fiduciary relationship as a matter of law. Not as joint venturers, not as shareholders, not as members of an LLC, because they weren't that prior to this contract. They allege the duty to disclose in their complaint based on the defendants holding themselves out as experts in development, encouraging the plaintiffs to rely on that expertise, and the making of partial representations they knew to be misleading, incomplete, or untrue. There was no allegation of dominance or influence, superiority, or any relevant factors that deal with the existence factually of a special relationship, dominance relationship that would create basically a fiduciary relationship between them. In terms of what happened before the December 20th and 21st, in terms of signature, 2005 contract, the trial court determined by relying on one case, Hassan versus Yusuf, that there was a fiduciary relationship that existed between these parties. And that created the duty to speak. In Illinois, the duty to speak in fraudulent concealment cases is completely reliant upon the existence of a fiduciary relationship or special relationship. He found that to exist under Hassan versus Yusuf, which I submit is a clear, erroneous application of existing Illinois law to certain facts that are, in this case, undisputed. What is undisputed is that these men discussed the potential project. There was a letter of intent that was signed by one of them in November. The contract was created by plaintiff's counsel, as was the letter of intent. And the plaintiffs signed it on December 20th. The defendants signed it in a different place. We don't know where any of these people were. They couldn't remember. On December 21st, the day after, plaintiffs signed, and then the defendants signed on the face of the document the next day. Before that time, they had no relationship of any kind. Now, Mr. Riggs did know the plaintiffs because he was involved with them in a similar operation, ROI, which was a land development where they had a professional who was handling development matters. So he knew them. He had had a relationship with them in that particular project. They ended up buying him out of that project. But as to Heritage Fields, in terms of its acquisition, in terms of the project itself, there was no relationship between these parties before this contract was signed. The trial court found the existence of a fiduciary duty. The indispensable element. I'm sorry? Is that a finding of fact or law? I believe that that is a finding of law. I believe that the existence of a fiduciary duty is a question of law. It's a mixed question, I suppose, Your Honor, in the sense that the principles of law as to what constitutes a fiduciary duty were applied to the facts of this case. My point is that there is a complete absence of facts in this case that could support the application of that legal principle. The effect, I believe, of that finding is, if it's correct, any time anyone negotiates or discusses with anyone about the prospect of a joint venture, partnership or otherwise, everything they do and say before they enter into that relationship has the characteristic of disclosure required of someone holding the highest duty of loyalty in a fiduciary capacity. That is simply not the case and could not be the case in the business world. To move on, to one of the misrepresentations the court found, the statement that there were no impediments to be a statement of material fact and a fraudulent misrepresentation. I believe, first, that there was insufficient evidence on a clear and convincing standard basis that that statement was made. It might be perceived as me being engaged in semantic analysis. No one testified that these men said that there were no impediments to final plan approval. The testimony was frankly very general. We had discussions here and we had discussions there. They told us that there were no hurdles to approval, that there were no obstacles to approval. So the hurdles and obstacles and impediments, you can glom together, I guess, and determine, I believe, that the trial court found that to be a statement of material fact that was false, knowingly false, and intended to mislead these men. I submit that that statement has really no meaning or context by itself. You have to look at other facts of the case, and in fact, it has no meaning unless you look at one of the found concealments that were deemed to be fraudulent by the court, which is the failure to talk about storm water issues. That's the impediment that leads to the approval question. In fact, I submit that obstacles and impediments and that type of language, when you look at the entirety of the testimony relevant to that, particularly the knowledge that can be imparted to these defendants through Wascheleski, the architect, and Mr. Cusick, the city engineer, I'm sorry, the project engineer, and Cusick, the city engineer, as well as the parties, I believe that it's crystal clear that, in fact, if it was made, if the statement was made, it's a statement of belief or opinion. An obstacle is in the eye of the beholder. Every project of this nature in the city of Ogletree, and probably anywhere, requires storm water work. You have to present storm water specifications. You have to provide for it. The fact that the engineer thought that there was some work to be done and that the testimony was unclear, even through Cusick and Wascheleski, as to what was really discussed about phase three, all pre-contracted 2005, I believe indicates that there's an insufficiency of evidence, but also that these were not statements of fact, but statements of contingent or future events, future expectations, probabilities of a third party with governing control over the issue. I'm running out of time quickly, Your Honors. I believe that the written statement of no encumbrances of property in the LLIPA, the actual contract, cannot be fraudulent. It is in a contract, the contracted issue, created by the plaintiffs, signed by them first, sent to the defendants, signed by the defendants second, so this statement of no encumbrances in writing in the very contract cannot be fraudulent misrepresentation that induced the signing of that contract by the plaintiffs that happened first. In terms of intent to receive and justifiable reliance, I have tried to analyze those matters factually in the brief as well as I can. I believe that justifiable reliance is a very large issue in this case, Your Honors. The statements regarding no encumbrances and no impediments, even if deemed factual and made and false, are vague and indefinite. Case law says you cannot rely on vague and indefinite statements. I believe I would like to finish with the issue of let me say this, waiver and latches were my affirmative defenses. I have briefed those as well as I can. I will rely on my brief for that purpose. The absence of evidence as to injury, I believe, is very important here. The Gerald Corp. v. Hardgrove case, but particularly the court's reliance, I believe, displaced reliance on the Giammanco decision because he stated repeatedly that the bargaining process here had been tainted, that it had value and it had been tainted, and that was the injury to the plaintiffs. I do not believe that that is sufficient. We require evaluation evidence, and there was none. If there are no questions, thank you. Sorry I talk so fast. Mr. Elliott, you may respond. May it please the court, counsel, my name is Tim Elliott. I represent the plaintiff at Belize in this case. If I could, I'd like to start with the standard review and the issue of credibility, and then move into what I think is really the thrust of Mr. Siegler's argument, which is the fiduciary duty finding. The standard of review before you, with one limited exception, is manifest weight of the evidence, and that is because Judge Doherty here had a long trial over the course of six days, observed the demeanor of the witnesses, saw them speak, and made credibility determinations. He saw them firsthand, and I think it's fair to say he believed us and not them. We've pointed out to you in our brief in several places where he made express credibility findings, saying that the testimony of Mr. Riggs or Mr. Reagan was simply not credible, but there are numerous other places where there was divergent testimony, and in every instance that we can find where there was a case of divergent testimony that was material, he sided with us. He repeatedly cited the testimony of Mr. Constantine, Mr. Thorne, Mr. Wacholeski, in places where Mr. Riggs and Mr. Reagan had disagreed. That says a lot about the case here. Now, Mr. Siegler has tried very hard to avoid challenging those credibility determinations on this appeal, and I think with good reason, and he's tried to focus his appeal on legal issues, but you cannot escape the credibility issues in this case because the findings of law and the legal applications have to be based upon sufficient facts, and they simply don't have the facts necessary to overcome this very deferential standard of review. Most of the argument you just heard was on the issue of fraudulent omissions and whether there was a duty of disclosure here. And I want to start by saying two things. Number one, we believe that the circuit court was exactly right in finding a duty of disclosure, but number two, we don't believe that it was actually necessary to the circuit court's opinion. In fact, if you take the omission portion of the circuit court's opinion out, you reach the same result. Why? Because there were two omissions that Judge Doherty found. There was an omission where Mr. Riggs and Mr. Reagan failed to mention anything about the stormwater issues that the project faced, and there was an omission where Mr. Riggs and Mr. Reagan failed to mention a right of repurchase on one of the parcels on this project. On both of those subjects, Judge Doherty also found affirmative misrepresentations. So if you took the omissions out, you still have affirmative misrepresentations on those subjects. What Judge Doherty said is you can characterize it either as a fraudulent statement or as an omission or both, and he went with both. So my point is, if you take that portion out, you don't even need to talk about Judge Doherty's finding of a duty of disclosure. You reach the same result in the case. Now, having said that, we believe Judge Doherty was correct in finding a duty of disclosure here. I have to disagree with something that counsel said. What he said was a duty of disclosure is the same as a fiduciary duty, and that's just not the law in the state of Illinois we would submit to you. What the court decisions in Illinois tell us is that a duty to speak or a duty to disclose arises in two general circumstances. Number one, if you have a fiduciary or confidential relationship, and number two, even if you don't have that type of relationship, but if you engage in some conduct that would give rise to a duty of disclosure. For example, if I tell you a duty to then go ahead and tell you the rest of the story. If I engage in conduct that's designed to steer you away from a particular fact or to suppress a particular fact, I take it upon myself a duty of disclosure. And that exists even in the absence of a fiduciary or confidential relationship. That's the Brown case, the Hirsch case, and the American Hardware Manufacturers case which we cited in our brief. In this particular case, the circuit court made findings of both. The circuit court found the existence of a fiduciary duty and explained why, and I'll get to that in just a moment, but the circuit court also found other conduct that would give rise to a duty of disclosure even in the absence of a fiduciary duty. For example, the circuit court noted that, and this is on page 21 of the opinion, even though Mr. Riggs and Mr. Reagan were required to record a memorandum with the recorder in LaSalle County to make public the right of repurchase, they didn't do it. And the circuit court found that was conduct that was not proper and resulted in my clients not being able to find out about that right of repurchase. In addition, the circuit court found that Mr. Riggs and Mr. Reagan made affirmative statements to my clients regarding a lack of encumbrances and a lack of obstacles or hurdles or impediments that gave rise to a duty to tell the full truth and the full story on those subjects. So the circuit court found two bases for duty to disclosure, other conduct, which I just addressed, and then the question of a fiduciary duty. With respect to the existence of a fiduciary duty here, the question is not if a fiduciary duty existed. The question I would submit to you is really when the fiduciary duty came into existence. The position that the defendants in this case have taken is that there is no fiduciary duty until the documents are signed and the LLC purchase is finalized and all of the parties are members in an LLC. That would lead to some absurd results, because if you think about that, what that would mean is that Mr. Riggs and Mr. Reagan would have no duties, to be honest and forthcoming with my clients in negotiations, but then the second the deal was finalized they would have an affirmative duty to say, hey listen, remember all that stuff we told you when we were negotiating? Well, a lot of that was baloney and let me tell you what the real story is. That is not a logical result, but also note that that result would still be fatal to them. Why? Because the agreement was signed in December of 2005, which is when the appellants contended duty kicked in, but wasn't closed until March of 2006 and there's no evidence in the record that any of these disclosures were made during that time period. The better position I would submit to you is the position of the Hassan case, similar case where the court said there may be instances in which a duty exists prior to the actual transaction because of the nature of the transaction. It bears mention that this was not a sale of a piece of property or the sale of a business. This was an invitation to become common venturers in a company. This was an invitation to join a venture. It was an invitation by our team. That's different than a traditional arms length transaction like the sale of a piece of property or something like that. In the Hassan case, what the appellate court said is given the facts and circumstances of that case where a group of investors were working together to figure out how to structure the purchase of a gas station and a purchase of a piece of property, and given the fact that they weren't just buying a piece of property, they were also negotiating the establishment of a business in which they would be joint venturers, under the facts of that situation, a fiduciary duty arose prior to the actual transaction. And the defendants in that case, as the parties with superior access to information, had a duty to tell the plaintiff, who was a partner in the venture or soon to be partner in the venture but not quite as sophisticated or quite as on the inside as they were, all the facts associated with the venture. We submit that if you have to reach the question of the fiduciary duty in this case, that the Hassan case provides the road map for you to follow. And again, in a fiduciary duty situation, you look at the facts and circumstances here, and here, this was an invitation, as I said again, to plan our team and to join a venture on an ongoing basis. I do want to address a couple of other points raised by Mr. Siegel during his presentation. He indicated his belief that this was really about four misrepresentations, two affirmative and two omissions. I don't think that's correct. We alleged six different areas of misrepresentations in our complaint. In its opinion, the circuit court focused on two of them as being the most important ones. I think he referred to the crux of the complaint. But he also said that those two were part of a larger pattern that included the others. And he made specific findings that the other misrepresentations had occurred. And he did that at pages 13 and 14 of the opinion. And the circuit court said, collectively, the various statements and omissions constituted a pattern of conduct with the intent  of the bargaining process. So the circuit court found that all of the misstatements that were alleged had, in fact, occurred, but really focused on two of them as, in its opinion, the most material of the bunch. Mr. Wyatt, could you talk a little bit about reasonable reliance? I sure can. The record shows in this particular case that my clients did not just jump in to this particular transaction. Beginning in August of 2005 and up through the time that the purchase contract was signed in December of 2005, which is a period of, I suppose, three or four months, they made site visits. They ran pro formas. They had conferences with Mr. Riggs and Mr. Reagan. They brought in a prospective third investor, Mr. Schmidt. They had meetings in Mr. Constantine's house. There was a meeting with all hands on board at the face-to-face meeting in Chicago. There was a considerable amount of due diligence that was done, a considerable amount of analysis that was done, and Mr. Thorne and Mr. Constantine testified at length about the fact that they relied on the materials given to them by the defendants. The suggestion appears to be that my clients should have gone further and should have actively investigated the things that were told to them by Mr. Reagan. They should have, for example, hunted down the engineer and gone and met with him personally and verified what they had been told by Mr. Riggs and Mr. Reagan. That's just not the law. And we've cited, too, the Hassan case and the Sims case to say where someone who claims to have superior knowledge and experience and claims to have knowledge of the matters on which they are addressing tells you something, you have a right to rely on that without further investigation unless something they say really runs up a red flag. And there was nothing in this particular case that would have run up a red flag for my clients. In fact, the other available evidence that they looked at supported the things that Mr. Riggs and Mr. Reagan were telling them. The preliminary plat, for example, that was approved covered both phases, two and phase three, that was consistent with what they were being told, which was that they were all going to be developed at once. So there was nothing that was made clear to them that the circuit court found or the evidence shows should have made them say, wait a minute, we're not certain that these guys are telling the truth. That's particularly the case because one of the two defendants, Mr. Riggs, was known to them from another deal, the ROI investment. And so he wasn't a stranger to them. At the point where they found out that the defendants were no both phase two and phase three being the subject of their agreement and $550,000 not being the limit of the completion of those two phases, didn't they have some notice at that point that they should probably check into something? Well, that was in basically the fall of 2006, what the court found. And at that point they discovered, as you said, that the project was basically going to take twice as long and cost twice as much. The way they responded to that was to say, well, if this is all, if this is the totality of everything, we can proceed with the project. What they didn't discover, though, at that point, and what was not notable to them up until that point, was that there were other issues, such as the non-recorded encumbrance on phase three. But my question is, at that point, shouldn't they have started to have some doubts about what they were being told by the defendants? I think they did have doubts about that, but I'd say two things. Number one, they were already in the deal at that point. And this is a claim to rescind the transaction. So they were already in the deal. And that's a very different situation from if they had been told about these things prior to March of 2006 when they could have backed out. The second thing is they tried to address that with an operating agreement that ironed out any further misunderstandings. The thing that really, sort of the straw that broke the camel's back here, was not only the revelation that there was an entirely different set of stormwater issues beyond those that they had been grappling with, but the storm by Mr. Riggs and Mr. Reagan back in 2005. That was really the first time that my clients, it hit them square in the face. Mr. Riggs and Mr. Reagan weren't just wrong. They weren't just mistaken. They actually lied to us. And that's the material representation of the court file. And is there anything in a record that they could have found to indicate that it was actually, is it Neal and Oliver? Oliver and Niles? Had developed Phase I and not the defendants? Well, I presume they could have FOIA'd the city of Oglesby, and certainly FOIA'd the city of Oglesby. I'm quite certain that those records would have shown that Oliver and Niles were listed as the developers. Of course, that doesn't tell you who else was involved in it. Those were the developers of records. But it clearly would have showed, as we found out when we got the case, that Oliver and Niles had developed the project and not Mr. Riggs and Mr. Reagan. There's one other place. The file, AEA, the engineers who were common to both the Oliver and Niles and Riggs and Reagan phases, AEA had a complete file on this, which included a number of the documents relating back to the Oliver and Niles phases. Thank you, Mr. Elliott. Thank you, Your Honor. Mr. Siegler, you may reply. Thank you, Your Honor. First, AEA was just mentioned as having a complete file. That is true. That's Mr. Wascheleski's firm. And no one, on behalf of the plaintiffs, ever asked to see any of that. AEA was the project engineer both for Oliver and Niles, and then were re-engaged by my clients. None of their documents were requested. And I would add, in the matter of justifiable reliance, the only thing that the plaintiffs ever looked at and they believed that they looked at, it was the plaque. Nothing else. And they didn't ask for anything else. They didn't seek anything out of any kind. They had two to three months to do that and vetted this project very closely in their own testimony. As to the matters that have been brought up by Mr. Elliott, on the expressed credibility findings made by the court, I differ with him. The trial court on page 12 of the opinion, for instance, states that the alleged representations that the project would not or would proceed in one phase and within one year, even if those statements were made, according to the trial court, were not of significance to the plaintiffs. The defendant's statement of prior development experience, even if made, because the testimony of Thomas Schmidt did not corroborate the plaintiff's testimony in that regard, was not of significance. So I really don't think that the expressed credibility findings, in terms of the parties' various aspects of their testimony, is quite as crystal clear in favor of the plaintiffs as Mr. Elliott indicated. Do we know why Mr. Schmidt decided not to invest? Yes, he said so. He said it was too far out, I think location-wise, and there was too much risk. He testified to that very succinctly. Too much risk? That's what he said. In terms of the nature of the misrepresentations found by the court and the omissions, I believe that I stated them correctly. I believe that the trial court's findings as to the concealments, fraudulent concealment under Illinois law, were expressly based on Hassan and the existence of a fiduciary duty, not some duty that's created by a half-truth, because, by the way, there are no half-truths in this case. There's no allegation or proof of a half-truth. These are all indicated to be bold lies or bold concealments. That's all. So that particular horse, I don't think, will run as to the question of a duty to speak. Hassan, I believe we read, Mr. Elliott and I, and I think the trial court and I, read that case very differently. If you read Hassan carefully, Your Honors, on pages 13 and 14 of my version, the court talks exactly about what the fiduciary duty involves. It went so far as to say, well, the trial court found that there was no fiduciary duty under count two, but that was based on a special relationship that was alleged to exist because of, I believe, representations of experience, etc., similar to this case. But then found that a fiduciary relationship existed between those parties based upon their joint business venture. That court cited CULP, Illinois Rockford v. CULP, which stands specifically for the proposition that shareholders in a company owe each other a fiduciary duty like partners do. I do not believe that Hassan in any way, shape, or form stands for the proposition that you can pre-create a fiduciary duty before you create the relationship of partners, corporate shareholders, etc. And with that, one more remark. On the half-truths, the Brown case, Brown said, a representation, though technically true, may nevertheless be fraudulent where it omits qualifying material, where a half-truth is sometimes more leading than an outright lie. I submit again, Your Honors, that there is no half-truth here. It doesn't involve any aspect of this case, and Brown doesn't apply. Thank you very much. Thank you, Mr. Siegler and Mr. Elliott, counsel, for your arguments in this matter this afternoon. It will be taken under advisement, and a written disposition shall issue. The Court will stand in recess until 9 tomorrow morning.